NANCY HUFF, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Huff v. Commissioner
Docket No. 8703-93
United States Tax Court
T.C. Memo 1995-200; 1995 Tax Ct. Memo LEXIS 200; 69 T.C.M. (CCH) 2551; May 4, 1995, Filed *200 Decision will be entered under Rule 155. Nancy Huff, pro se. For respondent: Harris L. Bonnette, Jr.
GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioner's 1989, 1990, and 1991 Federal income taxes in the amounts of $ 38,104.16, $ 802.04, and $ 614.55, respectively. Respondent also determined accuracy-related penalties under section 6662 [1] for the respective taxable years in the amounts of $ 7,620.83, $ 160.40, and $ 122.91. After concessions, the issues remaining for our consideration are: (1) Whether petitioner is entitled, under section 104, to exclude any part of the $ 187,500 lawsuit settlement she received in 1989; (2) whether petitioner is entitled to claim dependency exemption deductions for her daughter for 1990 and 1991 and to use head of household rates for those years; (3) whether petitioner is entitled to certain medical deductions; and (4) whether petitioner is liable for accuracy-related penalties under section 6662 for 1989, 1990, or 1991. *201 FINDINGS OF FACT [2]
Petitioner resided in Winter Haven, Florida, at the time her petition in this case was filed. Sometime during 1983, petitioner became involved with Joe Gandolfo (Gandolfo). Gandolfo lived near petitioner in Florida, and petitioner, at a time when she was anticipating a divorce, sought Gandolfo's financial advice, for which he charged $ 1,000. Gandolfo later sent petitioner prospective investment materials, and petitioner became more involved with and reliant on Gandolfo as her financial and tax adviser. Gandolfo referred petitioner to accountants, lawyers, and investment opportunities. Gandolfo advised petitioner to invest in the International Thoroughbred Bloodstock Agency, Inc. (ITBA), a horse syndication corporation. ITBA was based in Fort Lauderdale, *202 Florida, with a horse farm in Ocala, Florida. ITBA engaged in the breeding of racehorses and the syndicating of its stallions, broodmares, and yearlings for sales percentages. Unbeknownst to petitioner, Gandolfo received 15 percent of any referred investors' gross investment dollars flowing to ITBA. On July 24, 1984, petitioner invested $ 9,800 for a one-fortieth interest in an ITBA syndication known as "Mr. Pleasure I", involving a stallion and broodmares. A certified public accountant, Richard Derk, prepared petitioner's 1984 through 1991 Federal income tax returns. On her 1984 tax return (in connection with the ITBA investment) petitioner claimed depreciation deductions, based on the following reported costs of animals: Type of Animal
Reported Cost
Claimed Depreciation
Stallion
$ 20,000
$ 3,000
Four broodmares
40,000
10,000
Stallion
2,000
300
Four broodmares
4,000
1,000
Total  66,000
14,300
Petitioner also claimed $ 836 for farrier expenses on her 1984 return. Petitioner invested an additional $ 50,000 in ITBA syndications during 1985, and on her 1985 return, claimed a combined total of $ 28,510 in depreciation deductions with respect to her ITBA *203 investments. Petitioner also claimed other farm expenses in connection with various horses totaling $ 82,343, and she reported income from the horses of $ 19,549. During 1986, ITBA collapsed and went into a liquidating bankruptcy. In May 1986, petitioner learned of these problems, and that she would not be paid anything from her ITBA investments. On her 1986 income tax return, petitioner claimed a $ 54,190 loss attributable to the undepreciated adjusted basis of the horses. That loss consisted of a $ 97,000 cost basis, less $ 42,810 of previously claimed depreciation. The entire $ 54,190 was used to offset petitioner's citrus farm income. On her 1986 return, petitioner reported $ 8,000 of income, and claimed $ 1,040 of expenses concerning the horses. The ITBA loss caused severe financial pressure and reversals to petitioner. In that connection, and, after learning of the collapse of ITBA in 1986, petitioner began to experience stress. Prior to 1986, petitioner had been successful in earning income from her citrus grove business activity, but the ITBA collapse resulted in her becoming heavily indebted with mortgages on her grove property and less able to repay the debt. During *204 1988, petitioner's attorney filed a complaint against Gandolfo seeking money damages in excess of $ 145,000 in connection with her ITBA investment. Remuneration was sought on eight alternate grounds: (1) Federal securities laws, (2) Federal RICO laws, (3) Florida Civil Remedies for Criminal Practices Act, (4) common law fraud, (5) negligence, (6) breach of fiduciary duty, (7) Florida Deceptive and Unfair Trade Practices Act, and (8) misleading advertising. Petitioner sought actual damages, punitive damages, attorney's fees, prejudgment interest, court costs, and any other relief that the court deemed just and proper. Petitioner's complaint did not contain any specific personal injury allegation. Petitioner understood that her lawyer sought punitive damages because of her emotional distress and because of her loss regarding her business reputation. During 1989, petitioner executed a release of her claims against Gandolfo in exchange for $ 187,500. This document released Gandolfo and others from claims and demands "including but not limited to * * * personal injuries, emotional distress, loss of reputation and damage to business reputation". Of the $ 187,500 settlement, petitioner *205 received a net sum of $ 111,596.75 (after reductions for legal fees and court costs in the amounts of $ 75,000 and $ 903.25, respectively). When petitioner read and signed the release, she believed that the settlement was for emotional distress and mental stress. Thus, petitioner did not report any portion of the settlement on her 1989 income tax return. When petitioner signed the release and signed her 1989 Federal income tax return, she was not aware of the contents of the complaint filed against Gandolfo. Petitioner claimed her daughter, Sherry Brady (Sherry), as a dependent for 1990 and 1991. Sherry's 1990 Federal tax return (Form 1040EZ) reported adjusted gross income of $ 9,473.79. Sherry was 27 years old during 1990. During May or June 1990, Sherry moved in with petitioner and resided with her during the remainder of 1990 and until the fall of 1991. During 1990 petitioner provided Sherry with food, paid $ 559.90 for Sherry's auto insurance, and provided her with a $ 9,400 allowance. Sherry lived with petitioner until about September 1991, when she moved to Chicago to attend school. In 1991, Sherry did not have sufficient taxable income to file a tax return, and she *206 was supported by petitioner. Petitioner paid $ 599 for auto insurance, and provided an allowance of $ 16,300 to Sherry during 1991. Petitioner spent $ 1,500 on Sherry's food for each of the years 1990 and 1991. At the end of 1991 (during the holiday season) Sherry occasionally worked in a department store in Chicago. OPINION [3]
Settlement of the Gandolfo litigation -- Petitioner relied on the advice of her financial and tax adviser, and invested in horse-breeding syndications. Her investment collapsed, and she claimed an ordinary loss to reduce her 1986 gross income (in an amount equal to the adjusted basis of her investment). Subsequently, petitioner sued her adviser and the complaint contained allegations of wrongdoing by Gandolfo, but did not specifically seek damages for personal injury. Petitioner's loss was substantial in relation to her total assets and sources of income, *207 and it placed her in a difficult financial situation. These financial reverses caused petitioner to experience extreme emotional stress and caused her to seek various types of medical treatment (which is more fully addressed in the "Medical Expenses" section of this opinion). In the final negotiation and resolution of petitioner's claim, Gandolfo agreed to settle petitioner's claim for an amount that was close to double her reported tax-cost basis for the investment. The settlement document contained the statement that the amount to be received by petitioner was for but "not limited to * * * personal injuries, emotional distress, loss of reputation and damage to business reputation". Under these circumstances, petitioner did not report any portion of the settlement, contending that it was for personal injury. Respondent determined that petitioner's complaint did not sound in tort or plead any personal injury, so that no part of it could be tax exempt under section 104. Respondent argues that section 111 will apply if we find that any portion of the settlement is exempt. That section [4] would render taxable any portion of the settlement that is represented by tax benefits already *208 received by petitioner. Section 104(a)(2) excludes damages received due to personal injuries. The term "personal injuries" includes nonphysical as well as physical injuries. Downey v. Commissioner, 97 T.C. 150, 159 (1991) (and cases cited therein), supplemented by 100 T.C. 634 (1993), revd. on other grounds and remanded 33 F.3d 836 (7th Cir. 1994); see also United States v. Burke, 504 U.S. 229,     n.6 (1992). Accordingly, the distinction made is one between personal and nonpersonal injuries and not between physical and nonphysical injuries. Downey v. Commissioner, supra at 159 (citing Roemer v. Commissioner, 716 F.2d 693, 697 (9th Cir. 1983), revg. 79 T.C. 398 (1982)). *209 Excludable damages under section 104 are those that are received in pursuit of tortlike claims, and not those that arise out of economic or contractual rights. Id. at 160 (citing Byrne v. Commissioner, 883 F.2d 211, 215 (3d Cir. 1989), revg. 90 T.C. 1000 (1988)). Where damages are received pursuant to a settlement, excludability depends on the nature of the claim that was the actual basis for settlement rather than the validity of the claim. Id. at 161 (and cases cited therein). Accordingly, we must determine here whether any portion of the $ 187,500 settlement was from a tort or tortlike injury. Respondent focuses solely on petitioner's complaint (which does not specifically plead any damages attributable to personal injuries). [5] Petitioner, on the other hand would have us focus solely on the settlement document (in the form of a release) which includes nonspecific claims for personal injuries and emotional distress. Obviously, we must consider both documents and other aspects of the record to decide the nature of the claim and the nature of the settlement. *210 Respondent's position is that the entire $ 187,500 settlement is nonpersonal. This, however, contradicts respondent's position that petitioner's investment was limited to $ 97,000, as opposed to the more than $ 200,000 that petitioner argues represents her basis. Petitioner testified that certain bank transfers, in excess of the $ 97,000 paid to ITBA and claimed on her income tax returns, were also payments made to ITBA for additional syndications. The record, however, does not support petitioner's testimony. The referenced bank transfers do not show the payee. Further, petitioner's income tax returns do reflect a tax cost basis of $ 97,000, both for purposes of claiming depreciation and for the ITBA loss. Moreover, this situation is further complicated by petitioner's complaint against Gandolfo alleging, without explanation, money damages in excess of $ 145,000. Finally, the parties do not address the farming expenses claimed concerning petitioner's ITBA investment. The settlement document (release) reflects: "personal injuries, emotional distress, loss of reputation and damage to business reputation". Considering the complaint, the settlement, and the relationship of the *211 total investment to the total settlement, we conclude that the settlement was for $ 90,500 in personal injuries and for $ 97,000 for the nonpersonal loss of investment. Accordingly, $ 90,500 of the settlement is excludable under section 104(a)(2). See Stocks v. Commissioner, 98 T.C. 1, 17 (1992). Having decided that the settlement should be allocated, and that $ 90,500 of the $ 187,500 is exempt from tax, we must also consider the allocation of the legal fees and costs under section 265(a)(1). That section precludes a deduction for legal fees attributable to tax-exempt income. Stocks v. Commissioner, surpa at 17-18; sec. 1.265-1(c), Income Tax Regs. Hence, the $ 75,000 in legal fees and the $ 903.25 in costs must be allocated. We hold, for the same reasons underlying our holding on the allocation of the settlement that petitioner is entitled to deduct a legal fee of $ 38,800 and costs of $ 467. [6]
*212 Because we have held that $ 97,000, less the apportioned amounts for fees and costs, is taxable, it is unnecessary to consider respondent's alternate position (i.e., that section 111 would require petitioner to report the portion of the settlement attributable to the tax benefits). Dependency exemption for petitioner's daughter -- Petitioner claims that for 1990 and 1991 she was entitled to dependency exemption deductions for her daughter, Sherry, who was approximately 27 or 28 years old at the relevant times. Petitioner also claimed head of household filing status for 1990 and 1991, which would result in a lower rate of tax. Petitioner must show that she provided over one-half of her daughter's support and that her daughter earned less than the exemption amount for the taxable years in question, to claim the dependency exemptions. Secs. 152(a), 151(c)(1)(A). [7] Because petitioner's daughter earned more than the exemption amount in 1990, petitioner cannot claim a dependency exemption for her. *213 Petitioner's daughter lived with petitioner into the fall of 1991, and petitioner paid almost $ 17,000 for her daughter's support, not including food. Petitioner's daughter left petitioner's home during the fall of 1991 to become a student in Chicago, and she worked occasionally during the holiday season. Petitioner's testimony, along with the other evidence in the record, convinces us that her daughter did not earn more than the exemption amount during 1991. Accordingly, petitioner has shown that she is entitled to claim a dependency exemption for her daughter for 1991. Furthermore, petitioner was not married, and she maintained her home for more than one-half of the 1990 and 1991 tax years as her daughter's principal place of abode. Accordingly, petitioner was entitled to file her 1990 and 1991 returns using head of household rates, under section 2(b)(1)(A)(i). Medical expenses -- Respondent disallowed petitioner's claimed medical deductions for 1989, 1990, and 1991. Respondent conceded that certain of petitioner's medical expenses would be allowable in each year, but that the conceded amounts did not exceed the 7.5 percent of adjusted gross income threshold. Accordingly, *214 we review the record without considering any of respondent's concessions. Petitioner does not contend that her daughter was a dependent for 1989, and, accordingly, is not entitled to any 1989 medical deduction on her behalf. Secs. 152(a), 213(a). Although petitioner was not entitled to claim a dependency exemption deduction for Sherry for 1990 (because Sherry had income exceeding the exemption amount), Sherry was petitioner's dependent, and her medical expenses paid by petitioner for 1990 remain deductible for purposes of section 213. See secs. 1.213-1(a)(3)(i), 1.151-2, Income Tax Regs.
For 1991, petitioner was entitled to claim an exemption for Sherry and is entitled to deduct any medical expenses paid on her behalf for that year. Under section 213, taxpayers are entitled to medical deductions for the cost of medical care (to the extent the total amount of such medical care exceeds 7.5 percent of one's adjusted gross income). "Medical care" is generally defined as "amounts paid * * * for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body, * * * [and] for insurance * * * covering medical *215 care". Sec. 213(d)(1)(A), (C). Petitioner bears the burden of proving that she is entitled to the medical deductions that she claimed. Rule 142(a). We shall consider the general, broad categories of items, and then apply our findings and analysis to each specific enumerated item in controversy. Petitioner had experienced substantial emotional stress and physical problems concerning the financial crisis involving ITBA. At the time the suit against Gandolfo was settled, petitioner owed approximately $ 300,000, evidenced by notes, secured by mortgages on her citrus grove. The shortfall between petitioner's settlement and her outstanding debt caused her to lapse into a state of mental depression. Petitioner, who considers herself well versed in medical concepts, decided that, rather than go to a psychiatrist, she would attempt to relieve her stress by other means. Petitioner went to the Maharishi Ayur-Veda Health Center in Palm Beach, Florida, and sought the assistance of Dr. Deepak Chopra, who specializes in the treatment of stress-related problems of the nervous system. Petitioner spent 5 days, on an outpatient basis, in the clinic for "parchakarmic" treatment. Her treatment *216 consisted of a special vegetarian diet to remove "toxics", two people performing body massages on petitioner, and hot oil bath treatments. In addition to her trip to the clinic in Palm Beach, petitioner had received massages from various individuals prior to and following her clinic visit. Donald D. Mayfield, a homeopathic acupuncture physician, whom petitioner used during 1990 and 1991, had suggested the use of body massage and colonic irrigation, in addition to her office visits with him. Petitioner must show that the massage treatment has a proximate relationship to "diagnosis, cure, mitigation, treatment, or prevention of disease". Sec. 213; Havey v. Commissioner, 12 T.C. 409, 411-412 (1949). "In considering the question of deductibility of expenditures for 'medical care' under section 213, it is necessary to bear in mind that section 262 prohibits deductions for personal, living, and family expenses." Haines v. Commissioner, 71 T.C. 644, 646 (1979). In this regard, an expenditure that is merely for the benefit of one's general health, such as a vacation, is not an expenditure for medical care. Sec. 1.213-1(e)(1)(ii), *217 Income Tax Regs.
We have no doubt that petitioner believed that these massages would relieve her mental stress. Petitioner's acupuncturist also suggested massages for petitioner's "lymphatics", [8] in addition to his treatment. Despite these factors, we do not find that the section 213 medical care definition covers petitioner's massages. In this setting, we find that the massages were more for petitioner's general well-being than for the cure, mitigation, treatment, or prevention of a specific disease. See sec. 213. In reaching our conclusion, we have considered the fact that petitioner had received massages prior to her acupuncturist's suggestion -- which we note is not the same as, for example, a medical prescription. Certain treatments are inherently *218 medical in nature (i.e., surgery), and taxpayers have little difficulty convincing the Commissioner or courts that such procedures fit within the section 213 definition. Other treatments, however, such as a massage, are more commonly recognized as nonmedical procedures intended for an individual's general well-being. In those instances where a normally nonmedical procedure is claimed as a basis for a medical deduction, the burden is on such taxpayers to show that the procedure comes within the requirements of the statute. See, e.g., Murray v. Commissioner, T.C. Memo. 1982-269. Petitioner has not shown that her massages fit the requirements of the statute. Based on the record, we hold that the massages were for petitioner's general well-being, and were personal within the meaning of section 262, and therefore not deductible under section 213. Estate of Levine v. Commissioner, T.C. Memo. 1982-05, affd. without published opinion 729 F.2d 1441 (2d Cir. 1983); Gersten v. Commissioner, T.C. Memo. 1980-487. Similarly, amounts paid by petitioner to attend a wellness *219 center for use of the exercise and spa and her yoga lessons were also for her general well-being and do not meet the section 213 requirements. During 1989, petitioner visited Dr. Rothenberg, expressing concerns about obesity, intermittent depression, and stress-related fatigue. Dr. Rothenberg conducted an exam of petitioner for $ 165, and his advice was "HEALTH MAINTENANCE HOT TUB". Dr. Rothenberg was affiliated with the Maharishi Ayur-Veda Medical Center. Petitioner purchased a deck and hot tub to be annexed to her home. The cost of the hot tub alone was $ 3,157.74 and, together with the deck, petitioner's total hot tub expenditures were $ 4,528.68. Initially, petitioner had claimed about one-half the cost of the hot tub as a medical deduction, but for purposes of trial, she took the more aggressive position that the entire hot tub and deck should be deductible as a medical expense. During 1991, petitioner purchased a water filtration system for her home, on recommendation of the person who performed her colonic irrigation. Hot tubs and water filtration systems promote one's general well-being. Therefore, petitioner must show that her purchase and use meet the statutory *220 definition for a medical deduction. Although it is possible that a hot tub or water filtration system was somewhat beneficial to petitioner's condition, she has not shown that the cost incurred was for the primary purpose of and/or was directly related to her medical care. Haines v. Commissioner, 71 T.C. 644, 647 (1979). Additionally, regarding petitioner's capital improvements, she must show that her expenditure did not result in increased value to her home. If the expenditure were deductible, a taxpayer would be entitled to deduct only the portion of the cost that does not enhance the value of the property. Ferris v. Commissioner, 582 F.2d 1112 (7th Cir. 1978), revg. T.C. Memo. 1977-186; Gerard v. Commissioner, 37 T.C. 826 (1962); Keen v. Commissioner, T.C. Memo. 1981-313; sec. 1.213-1(e)(1)(iii), Income Tax Regs. Petitioner has failed to meet her burdens with respect to the hot tub, water filtration system, and/or deck. See also Gardner v. Commissioner, T.C. Memo. 1983-541. Petitioner also engaged *221 in a regimen that included vitamins and food supplements, and she purchased a juice extractor. Special diets and food supplements may be deductible for purposes of section 213. Randolph v. Commissioner, 67 T.C. 481 (1976). However, petitioner must show that they were for her medical care. Ford v. Commissioner, T.C. Memo. 1979-109. Petitioner must also show that any cost claimed exceeded the normal cost of her diet. Clark v. Commissioner, 29 T.C. 196, 200 (1957); Flemming v. Commissioner, T.C. Memo. 1980-583. With respect to her random purchases of vitamins and food supplements, petitioner has shown neither. Petitioner, experiencing symptoms of colitis, [9] went to Donald Mayfield, who practices acupuncture. Petitioner also had parasites in her colon. Mr. Mayfield, by inspecting specific pressure points in the body and with the aid of a computer, analyzed petitioner's body conditions. Petitioner was analyzed in Mr. Mayfield's office on numerous occasions during 1990 and 1991, and he provided petitioner with homeopathic [10] pills and liquid medicine to *222 treat her condition. Mr. Mayfield also prescribed enterolavage (i.e., colon irrigation) treatment for petitioner. Following her overall treatment, petitioner's colitis and other intestinal problems were ameliorated. One of the larger items being claimed by petitioner is a $ 9,300 payment to Edward Sears for the purpose of "stress management". Petitioner has presented no evidence that would explain "stress management" vis-a-vis Edward Sears or how such expenditures would qualify as "medical * * * cure" under section 213. Petitioner has also failed to provide the Court with *223 sufficient information regarding several other disallowed items. Consequently, she is not entitled to deduct them, although they may appear to be, at least, potentially deductible (e.g., $ 41.09 paid to the Winter Haven Hospital). In accordance with our above findings, holdings, and discussion, the following chart reflects the amounts petitioner expended, the payees, and each alleged medical purpose claimed, and the amounts we find to be allowable and deductible (to the extent they cumulatively exceed 7.5 percent of petitioner's adjusted gross income in any of the 3 taxable years): Amount
Amount
Payee Medical Purpose Claimed Claimed Allowed 1989
Susan Morgan
Kathleen Cook
Pam Brown
Massages
$ 540.00
-0- Maharishi Ayur-Veda
Medical Center  Massages, oil baths
1,413.84
-0- Maharishi Ayur-Veda
Medical Center  Meditation tape
44.75
-0- Dr. Rothenberg
Office physical
165.00
$ 165.00
Prestige Spas/Tubs
Hot tub for
stress relief  3,157.74
-0- Regency Wellness
Fitness evaluation
127.50
-0- Jackson Nutritional
Vitamins
39.53
-0- Maharishi Ayur-Veda
Medical Center  No purpose stated
20.00
-0- Bunnie Beatty
Yoga lessons
30.00
-0- Winter Haven Hosp.
No purpose stated
41.09
-0- Metpath
Chlamydia-rapid
screen (Sherry)  43.00
-0- Smith's Pharmacy
Drugs (Sherry)
249.07
-0- Ridge Pathology
Pap smear (Sherry)
8.00
-0- Drs. Baker/Puckett
Office visit (Sherry)
60.00
-0- Drs. Baker/Puckett
Office visit
110.00
110.00
Fillastre, Dentist
Dental work
188.00
188.00
Bausch & Lomb
Interplak
29.00
-0- Gessler Clinic
FAA phy
45.00
-0- McLean Chiropractic
NUC (energenics)
36.00
-0- Ridge Pathology
Pap smear
8.00
8.00
Heart of America
Health insurance
1,736.05
1,736.05
Tom Waller
Vitamins
77.25
-0- Edward Sears
Stress management
9,300.00
-0- Total 1989  2,207.05
1990
Fillastre, Dentist
Dental work
$ 639.80
$ 639.80
Drs. Baker/Puckett
Office physical
(Sherry)  55.00
55.00
Drs. Baker/Puckett
Office physical
55.00
55.00
Ridge Pathology
Pap smears
18.00
18.00
Donald Mayfield
Acupuncture
2,489.65
2,489.65
Doctor Highsmith
Colon Hydro-therapy
2,983.00
2,983.00
Susan Morgan
Massages
285.00
-0- Doctor Wood
No purpose stated
45.00
-0- Drs. Fisher/Schemmer
Eye exam
32.50
32.50
Health Food Center
Vitamins
89.73
-0- Maharishi Ayur-Veda
products  No purpose stated
15.00
-0- Jackson Nutritional
Vitamins
42.68
-0- Dental Institute
Dental work
800.00
800.00
Smiths Pharmacy
Medicine
499.05
499.05
Dr. Heller
Chiropractic
30.00
30.00
Total 1990  7,602.00
1991
Fillastre, Dentist
Dental work
$ 548.00
$ 548.00
Donald Mayfield
Acupuncture
1,759.00
1,759.00
Dr. Highsmith
Colon hydro-therapy
1,975.00
1,975.00
John Shen Inst.
Acupuncture
200.00
200.00
Dr. Lucido
No purpose stated
30.00
-0- MBCA
No purpose stated
30.00
-0- Susan Morgan
Massage
400.00
-0- Frank Brown
Tina Kalbileisch
Becky Johnson
Massage
240.00
-0- Mr. McCloud
Chiropractic
204.95
204.95
Nat'l. Health Fed.
No medical purpose
stated  625.00
-0- Health Food Center
Fruit juicer and
food supplements  270.94
-0- Payee unclear
Sinus medicine
20.93
20.93
Dr. Solomon
Office visit, x-rays
270.00
270.00
Matol Botanical
No purpose stated
1,142.40
-0- Smiths Pharmacy
Medicine
50.84
50.84
Highland Health
Water treatment
Ctr.  and purification  system for home  3,986.00
-0- Total 1991  5,028.72
*224 Section 6662 -- Negligence or intentional disregard of the rules and regulations -- Finally, we consider the accuracy-related penalties under section 6662. Respondent determined that petitioner was negligent or that she intentionally disregarded rules or regulations, and that the section 6662(a) 20-percent addition should apply with respect to the entire underpayment, or with respect to all adjustments determined in the notice of deficiency. Negligence has been defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of showing that she was not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioner stated her reasons for not reporting the Gandolfo settlement. She noted that the release indicated that it was for personal injuries and, based on her background and knowledge, we find that belief to be reasonable. Furthermore, we have found many of petitioner's disallowed medical expenditures to be allowable and a similar amount *225 not to be allowable. Petitioner generally provided fairly complete documentation, substantiating the expenditures. Some larger disallowed items involved technical distinctions. With respect to the medical expenses presented at trial, many larger items were items that petitioner had not claimed on her return, but were being claimed, perhaps in an attempt to offset any potential deficiency. We cannot say here that petitioner's claims were without any potential merit. This is especially true here because petitioner represented herself and is not an attorney, accountant, or one versed in tax law. Accordingly, we find reasonable cause and hold that petitioner is not liable under section 6662(a) with respect to her 1989, 1990, or 1991 tax years. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties' stipulation of facts and exhibits are incorporated by this reference. The fact findings regarding the medical deduction issues for 1989, 1990, and 1991 are combined with the legal discussion in the opinion portion of this report.↩
3. For convenience, factual findings concerning the medical deduction issues are incorporated in that portion of this opinion.↩
4. Sec. 111 is entitled "Recovery Of Tax Benefit Items", and subsec. (a) provides: "Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter."↩
5. With respect to the release, respondent suggests that it was contrived for tax purposes. The facts of this case show that petitioner's financial losses for ITBA caused her substantial emotional stress and physical side effects. The record reflects that petitioner expended relatively large sums of money for medical solutions to address her emotional and physical problems. Additionally, Gandolfo settled for an amount in excess of that sought in the complaint, and respondent has not offered any plausible theory for the difference. Hence, we believe that the release was bona fide in all respects.↩
6. Petitioner may deduct 51.7333 percent of the fees and costs ($ 97,000 divided by $ 187,500 times $ 75,000 and $ 97,000 divided by $ 187,500 times $ 903.25).↩
7. Although there are exceptions to this requirement for full-time students, those students must be less than 24 years of age at the end of the year in question. See sec. 151(c)(1)(B).↩
8. Lymphatic likely describes an improper functioning of the lymph glands. It has also been defined as a sluggish condition, which was formerly thought to be the result of too much lymph in the body. Webster's New World Dictionary of the American Language (1962).↩
9. Colitis is an inflammation of the mucous membrane of the large intestine. Webster's New World Dictionary of the American Language (1962).↩
10. Homeopathy is a system of medical treatment based on the theory that certain diseases can be cured by giving very small doses of drugs which in a healthy person and in large doses would produce symptoms like those of the disease. Webster's New World Dictionary of the American Language (1962).↩